## ISAAC SNYDER

### V.

## AUGUST SEIBOLD ET AL.

*Trust Deed—Error in Description—Sale of Premises Supposed to Have Been Incumbered—Consideration—Notice—Bill for Relief by Mortgagee.*

Where a trust deed erroneously described a tract of land not owned by the grantor, and the land intended to be described was subsequently sold by the owner and resold by his vendee, upon a bill filed by the mortgagee for relief, *held:* That the evidence failed to show such gross inadequacy of consideration in the sale by the mortgagor, as would authorize a court to grant relief on that ground, and that the evidence failed to prove notice on the part of defendants, of complainant's equities.

[Opinion filed September 20, 1890.]

APPEAL from the Circuit Court of Tazewell County; the Hon. N. W. GREEN, Judge, presiding.

Messrs. HOPKINS & HAMMOND, for appellant.

Mr. WILLIAM DON MAUS, for appellees.

CONGER, P. J. The facts of this case, so far as they are uncontested, are these:

On and prior to June 18, 1873, John A. Harris owned and was in possession of the south half of the northwest quarter of section eleven, township twenty-six north, range four, west of the third principal meridian, in Tazewell County. Harris

wanted to borrow $1,000 on his land, and Alexander Part-
ridge assisted him in making this loan by recommending him
to the appellant, and on June 18, 1873, appellant loaned
Harris $1,000, and took his note on five years time, with ten
per cent interest, and Harris, to secure the same, executed and
delivered the trust deed named in this record.    Isaac Snyder,
the appellant, is unable to read or write, and the trust deed,
which was intended to be made upon, and describe the afore-
said eighty-acre tract of land, and was at the time, and for long
afterward, supposed to do so by both parties, did, in fact,
through mistake of the attorney drafting it, describe the
north half of said quarter section instead of the south half,
the north half being owned and occupied by one Moran,
and to which Harris never had or claimed any title, and never
exercised any acts of ownership over it.    This trust deed was
recorded June 20, 1873.    Harris had difficulty with his family;
his wife left him, and he never paid anything upon the $1,000
note, except $50 interest.    For several years before anybody
discovered that his land was not properly described in said
trust deed, Harris made repeated efforts to sell it for $1,000,
subject to the Snyder incumbrances.    And he offered it to
Snyder for $1,000 over and above his indebtedness, and also
employed Partridge to assist him in making a sale, and both
Harris and Partridge made repeated efforts to sell the land
upon those terms.    On April 24, 1879, Harris borrowed of,
and became indebted to appellant, in the further sum of
$429.50, for which he also gave appellant his note and secured
the same by a second mortgage upon the said tract of land,
describing the property correctly, but this mortgage, through
carelessness of the same attorney, was lost and never placed
upon record.    On this last note $100 was paid.

Some time, from a few months to a year or two, prior to
June 1, 1885, Harris and Partridge and numerous other per-
sons ascertained the mistake in the said trust deed from
Harris to Snyder, and that the land records showed the said
incumbrance to be on the said Moran tract, and no incum-
brance was recorded against the said Harris tract.    And not
long after that fact was known, negotiations were set on foot

to secure a quit-claim deed from Harris of the said south half of said quarter section, and these negotiations resulted in a conveyance, by quit-claim deed, of the north seventy-eight acres of the said tract, by Harris to said W. C. H. Barton, on said first day of June, 1885. This deed was recorded July 8, 1885. For this conveyance Barton paid to Harris $1,000 cash, either his own money or Partridge's, and he claims also to have surrendered to Harris some notes which he held against him, amounting to from $500 to $700; this, however, is denied. The fair cash value of the land, at the time Barton bought it was about $4,000. On August 14, 1885, Barton conveyed the land, by quit-claim deed, to said August Seibold, for $1,500 cash and his three promissory notes, one for $800 and two for $500 each, which notes Barton held and owned at the time of the hearing in the court below, except one of the $500 notes, which had been paid to him by Seibold, and surrendered during the pendency of this suit. Just before this last named sale was made, Partridge visited the wife of Harris, at the residence of Bell, her son-in-law, and negotiated for the conveyance of her dower interest in the land for $50; and on said 14th day of August, 1885, Partridge again went to her, paid her $50, and procured her quit-claim deed to August Seibold. And this deed and the deed of Barton aforesaid, were both delivered to Seibold at the same time. Soon after Harris deeded the said land to Barton he left this section of the country. Appellant finally heard of him in Washington Territory, went there and hunted him up at Whatcome, learned from him some of the facts, and came back and took steps to have his deposition taken. His deposition was taken at Whatcome, Washington Territory, July 21, 1887, by an oral examination under the provisions of our statute. Partridge went out there and was present, and had counsel employed to cross-examine at the taking of this deposition. Harris died at Whatcome pending this suit, leaving no estate and insolvent, and the suit abated as to him, and his heirs were not made parties. As soon as appellant heard it said that there was a mistake of description in the trust deed, he had the records examined and ascertained the truth, and at

once commenced this suit on August 21, 1885, but the deed from Barton to Seibold had been already four days on record.

Upon the uncontested facts aforesaid, and others, which are made the subject of controversy, appellant filed his bill for relief.

Upon the facts shown by the record counsel for appellant submitted the following propositions, upon which they claimed that appellant was entitled to substantial relief.

"1st. We maintain that the land in question was worth, at the time Barton bought it, $4,000, and that he paid only $1,000 for it, wherefore the conveyance was voluntary and gratuitous as to the difference between $1,000 paid and the fair cash value of the land; and that Barton is the equitable trustee of the creditors and subsequent incumbrances of Harris for that difference, and for the rents and profits of the land, less interest on the $1,000, and such taxes and necessary disbursements as he has paid on account of the land.

" 2d. That Barton had such actual notice, and was put upon such legal inquiry, as to charge him with appellant's equities in the land in question, and render him equitably liable, if he has put the land beyond the reach of appellant's lien, for whatever injury appellant has sustained by reason of his acts.

" 3d. Barton, Partridge and Seibold, by their complicity and conspiracy with Harris to defraud the appellant and defeat his said security, have each rendered themselves individually and jointly liable, in equity, to appellant, for whatever injury he has sustained by their unlawful undertaking; and especially for the land, or the proceeds of the same, which have come into their hands or the hands of either of them.

" 4th. Seibold is liable to appellant for $1,800 and interest, being the unpaid balance of purchase money upon his purchase of said land from Barton, at the time this suit was commenced.

" 5th. Barton, without reference to his other liabilities, is liable for the $500 purchase money collected of Seibold since this suit was commenced.

" 6th. Partridge, by his complicity, fraud and conspiracy

to defeat appellant's security, has become liable in equity for whatever injury has resulted to appellant thereby."

The statement of facts as presented by counsel for appellant, together with the points made in their argument, sufficiently present the questions upon which the proper decision of this case rests.

First, as to the price paid by Barton, it appears that he paid $1,000 in cash, besides the surrender to Harris, as Barton claims, of some notes which he held against him, amounting to from $500 to $700.

Harris' wife, at the time, was not living with him, and did not join with her husband in the deed to Barton. Her rights in the land, whatever they were, still remained.

She clearly had an inchoate right of dower, and the right may have been regarded, both by Harris and Barton, as being much more valuable than it really was.

We can not say from these facts alone that there was such a gross inadequacy of consideration as to raise a presumption of fraud on the part of Barton in making the purchase.

Second, did Barton have actual notice of Snyder's mortgage, or did he have notice of such facts and circumstances as would put him upon inquiry. After carefully considering all the evidence we are inclined to hold with the court below that the evidence fails to make such a case as to charge Barton with either actual or constructive notice. Such knowledge on the part of Barton, as well as the charge of conspiracy between himself and Partridge, can well be suspected from all the circumstances and facts in evidence, but is not shown with sufficient clearness to authorize a court to so declare. If Barton was not chargeable with notice at the time he bought and paid for the land, it makes no difference that he may have had notice of Snyder's mortgage before he sold it to Seibold; hence the claim that Barton is liable to Snyder for the $500 collected from Seibold, and that Seibold is also liable to Snyder upon the unpaid balance of the purchase money due Barton, is in our opinion entirely without foundation.

The decree of the Circuit Court will be affirmed.

*Decree affirmed.*